## A10A0504. GEORGIA STATE FINANCING & INVESTMENT COMMISSION v. XL SPECIALTY INSURANCE COMPANY. A10A0581. FIREMAN'S FUND INSURANCE COMPANY v. BONITZ OF GEORGIA, INC. et al.

(694 SE2d 193)

BLACKBURN, Presiding Judge.

In this breach of construction contract action, owner Georgia State Financing & Investment Commission ("GSFIC") appeals in Case No. A10A0504 the grant of summary judgment to the surety company that warranted the roof of the newly constructed buildings for five years (XL Specialty Insurance Company, hereinafter "XL"), arguing that the trial court erred in its interpretation of the XL bond. Specifically, GSFIC argues that XL's bond on the roofs covered not only the five years after the architect was to issue its final certificate but also the time period before the issuance of that certificate. We agree with the trial court that the language of the bond meant that the bond covered the roofs only for the five years after the architect's issuance of the final certificate, and we therefore affirm in Case No. A10A0504.

In Case No. A10A0581, Fireman's Fund Insurance Company ("Fireman's Fund") appeals the grant of summary judgment to the subcontractor that installed the suspended ceilings in the buildings (Bonitz of Georgia, Inc., hereinafter "Bonitz"), arguing that some evidence showed that the installation was defective and negligently performed. We agree with Fireman's Fund that some evidence showed that Bonitz negligently installed the ceilings in nonconformance with contract specifications, and that therefore the trial court erred in granting summary judgment to Bonitz. Accordingly, we reverse in Case No. A10A0581. This moots Fireman's Fund's secondary argument that if Bonitz were properly granted summary judgment, Fireman's Fund should have also been granted partial summary judgment on the claims against it involving Bonitz's work.

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). A de novo standard of review applies to an appeal from a denial of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant. *Matjoulis v. Integon Gen. Ins. Corp.*[1]

So viewed, the evidence shows that on August 2, 2000, a general contractor and GSFIC entered into a construction contract for the construction of several buildings for a state hospital for an amount

---

[1] *Matjoulis v. Integon Gen. Ins. Corp.*, 226 Ga. App. 459, 459 (1) (486 SE2d 684) (1997).

just over $16 million. Fireman's Fund issued a performance bond on the project in favor of GSFIC in the same amount. Cf. OCGA § 13-10-40.

In an effort to close out the project, the general contractor, the architect, and GSFIC conducted a final inspection tour in early May 2003, and (as specified by the contract as part of the required close-out documents) the general contractor had XL execute on May 7, 2003 a GSFIC-prepared bond on the roofs and walls of the buildings "for a period of five years from the date of the execution of the final certificate of the architect." However, the architect expressly refused to issue a final certificate of completion because neither the work had been fully completed nor had the contract been fully performed.

During the months and years thereafter, GSFIC determined that the general contractor had not constructed the buildings in conformance with the contract and further determined that there were numerous defects in the buildings including leaks in the roof. After terminating the general contractor and hiring other companies to remediate the defects, GSFIC in January 2007 sued the general contractor and the architect, then added Fireman's Fund as a defendant (on its performance bond), and eventually added XL (on its roof bond). Bonitz and other subcontractors were added as third-party defendants on claims by Fireman's Fund that they had negligently performed their work in breach of their subcontracts and were obligated to indemnify Fireman's Fund for any resulting liability incurred by Fireman's Fund. The general contractor asserted a similar cross-claim against Bonitz.

XL moved for summary judgment, arguing that its bond covered only the five years after the architect had executed its final certificate of completion, which execution GSFIC affirmatively conceded had never occurred. GSFIC opposed summary judgment, arguing that the bond also covered the time period between its execution on May 7, 2003 and the issuance of the architect's final certificate. Interpreting the bond, the trial court granted summary judgment to XL, leading to GSFIC's appeal in Case No. A10A0504.

Bonitz also moved for summary judgment on the third-party complaint and the cross-claim against it, arguing that no evidence showed that its work was defective or nonconforming. Although Fireman's Fund opposed that motion, Fireman's Fund in the alternative moved for partial summary judgment in its favor on any GSFIC claims against it arising from Bonitz's work (should the court grant Bonitz summary judgment). Finding no evidence of defective work by Bonitz, the trial court granted Bonitz's motion for summary judgment but denied Fireman's Fund's related motion for partial

summary judgment, leading to Fireman's Fund's appeal in Case No. A10A0518.

## Case No. A10A0504

1. The central question in the appeal of the summary judgment granted to XL is the interpretation of its bond. Thus, we set forth some well-known principles of contract construction. First, the construction of a contract is a question of law for the court based on the intent of the parties as set forth in the contract, which construction we review de novo. *Deep Six, Inc. v. Abernathy*.[2] "The cardinal rule of construction is to ascertain the intention of the parties. If that intention is clear and it contravenes no rule of law and sufficient words are used to arrive at the intention, it shall be enforced irrespective of all technical or arbitrary rules of construction." OCGA § 13-2-3. Thus, "when the terms of a written contract are clear and unambiguous, the court is to look to the contract alone to find the parties' intent." (Punctuation omitted.) *Owners Ins. Co. v. Smith Mechanical Contractors*[3] (quoting *Park 'N Go of Ga. v. United States Fidelity &c. Co.*[4]). Only if the contract is ambiguous in some respect do we apply the rules of contract construction to resolve the ambiguity. *Avion Systems v. Thompson*.[5] See generally *Gill v. B & R Intl.*[6]

Here, in paragraph three of a document entitled "FIVE-YEAR BOND ON ROOFS AND WALLS," XL bonded to GSFIC the general contractor's performance relating to the hospital with regard to the following warranty: "[The general contractor] warrants with respect to the said work that for a period of five years from the date of the execution of the final certificate of the architect, the roofs of the building (or buildings) and roofs of covered passages . . . shall be absolutely watertight and free from all leaks." The contractor made a similar warranty with regard to the buildings' walls. In paragraph four, the contractor agreed that "should any leaks or defects occur in the roofs or walls of the [hospital, the contractor] will promptly remedy the said leaks or defects and pay for any damage to other work of the said improvement or project resulting therefrom. . . ." The bond was executed by the contractor and XL and countersigned by GSFIC on May 7, 2003.

---

[2] *Deep Six, Inc. v. Abernathy*, 246 Ga. App. 71, 73 (2) (538 SE2d 886) (2000).

[3] *Owners Ins. Co. v. Smith Mechanical Contractors*, 285 Ga. 807, 808-809 (2) (683 SE2d 599) (2009).

[4] *Park 'N Go of Ga. v. United States Fidelity &c. Co.*, 266 Ga. 787, 791 (471 SE2d 500) (1996).

[5] *Avion Systems v. Thompson*, 293 Ga. App. 60, 63 (2) (a) (666 SE2d 464) (2008).

[6] *Gill v. B & R Intl.*, 234 Ga. App. 528, 529-530 (1) (a) (507 SE2d 477) (1998).

The meaning of the bond is clear from its language. During a five-year period beginning on the date of the architect's execution of the final certificate, XL was bound to GSFIC to back up the contractor's warranty of the watertightness of the roofs and walls of the hospital. If the contractor failed to promptly remedy any leaks or defects in the roofs and walls occurring during this period and to pay for any damages caused to other work by said leaks or defects, then XL was liable to GSFIC for said nonperformance. Because the architect refused to execute the referenced final certificate due to the work not being completed, the time period covered by the warranty and bond referenced in this document did not begin. Thus, the court correctly granted XL summary judgment on GSFIC's claim under the bond.

GSFIC seeks to create an ambiguity by claiming that the language in paragraph four setting forth the contractor's duty to remedy any such leaks or defects was not constrained by the five-year period referenced in the warranty. This argument is not persuasive. The clear import of the document was to obligate XL to bond the contractor's warranty of the watertightness of the roofs and walls for a period of five years following the final completion of the buildings as evidenced by the architect's execution of the final certificate. That is the meaning of the warranty language "for a period of five years from the date of the execution of the final certificate of the architect" and indeed is consistent with GSFIC's own statement in its appellate brief that "[t]his language creates a time period for XL's liability based on the execution of the final certificate. . . ." The later language that the contractor was obligated to remedy any leaks and defects was referring to the contractor's obligation to fix watertightness problems occurring during the warranty period that began with the execution of the architect's final certificate, and not during a period that began immediately and would extend through eternity should (as here) the architect never execute a final certificate.

Even to the extent that the language could be construed to create an ambiguity, we would then apply the rules of construction to reach the same result. First, "any ambiguity would need to be resolved most strongly against the drafter of the contract," *J & E Builders v. R C Dev.*,[7] which here is GSFIC. See *Young v. Stump*[8] ("generally, an ambiguity is construed against the drafter"). Second, we would prefer the construction of the contract which would uphold the contract in whole and in every part, and would not construe one

---

[7] *J & E Builders v. R C Dev.*, 285 Ga. App. 457, 458 (1) (646 SE2d 299) (2007).

[8] *Young v. Stump*, 294 Ga. App. 351, 353 (1) (669 SE2d 148) (2008).

provision of the contract so as to defeat the plain import of another provision. See OCGA § 13-2-2 (4); *Ranwal Properties v. John H. Harland Co.*[9] The five-year warranty period referenced in paragraph three of the bond cannot be defeated by construing the language of paragraph four to require an unlimited warranty. Third, we would consider parol evidence (OCGA § 13-2-2 (1)), which would include GSFIC's own project manager's undisputed testimony that XL's roof warranty was not to begin until the architect's execution of the final certificate.

As an aside, we note that Fireman's Fund has submitted an amicus brief in Case No. A10A0504 to challenge the fact, agreed upon by both XL and GSFIC, that the final certificate of the architect has never been executed. Fireman's Fund's argument falls on deaf ears, as Fireman's Fund concedes in its brief that any determination regarding XL's bond coverage based on the existence or nonexistence of a final certificate "has no bearing on when the statute of limitations [which is Fireman's Fund's primary argument against liability in the main case] began to run on GSFIC's performance bond claim." In other words, Fireman's Fund has no dog in this fight and is not bound by this fact agreed to by GSFIC and XL as to XL's motion for summary judgment. Accordingly, Fireman's Fund has no standing to challenge this fact in this particular appeal. See *Wallace v. Scott*;[10] *Davidson v. State Farm &c. Ins. Co.*[11]

The trial court did not err in granting XL summary judgment in Case No. A10A0504.

### *Case No. A10A0581*

2. The trial court did, however, err in granting summary judgment to Bonitz since some evidence showed that Bonitz negligently performed its obligations set forth in its subcontract with the general contractor.

In its subcontract with the general contractor, Bonitz agreed to install the suspended ceilings in the buildings in accordance with the specifications of the contract between the general contractor and GSFIC. Bonitz further agreed to comply with provisions of the general contract and to indemnify the general contractor and its performance bonding company (Fireman's Fund) should they incur liability due to Bonitz's failure to install the ceilings properly. Finally, Bonitz agreed that its obligations to install the ceilings in strict

---

[9] *Ranwal Properties v. John H. Harland Co.*, 285 Ga. App. 532, 535 (1) (646 SE2d 730) (2007).

[10] *Wallace v. Scott*, 164 Ga. App. 129, 129-130 (1) (296 SE2d 423) (1982).

[11] *Davidson v. State Farm &c. Ins. Co.*, 161 Ga. App. 21, 22-23 (1) (288 SE2d 832) (1982).

accordance with the specifications would not be relieved by any inspections by the architect.

The specifications of the general contract required that the ceiling grid supporting the acoustical tiles would have to bear at least ten times the weight of those tiles; that the hangers holding up that grid would have to be spaced no further than four feet from each other; and that the hangers were to be attached to structural members of the buildings with sufficient anchorage. Bonitz was the only subcontractor to install the hangers, anchorage, and support for the suspended ceilings.

Within three years, the ceilings failed, sagging, deflecting, and sometimes collapsing at numerous points throughout the buildings. A 2006 report and subsequent affidavit of a consulting firm hired by GSFIC to inspect the buildings showed that the suspended ceilings were improperly anchored to the structure above the ceilings, that there was insufficient support for the ceilings throughout the buildings, that the hangers were not placed within the four-foot specification but were randomly and more widely spaced, that the anchorage to the structural members was weak and subject to failure, and that some hangers were not attached to structural members at all but were attached to electrical conduit. The firm concluded that all suspended ceilings in the buildings exhibited poorly executed and deficient suspension from the structure and recommended their entire removal and reinstallation in accordance with the contract specifications.

GSFIC presented other evidence that preceded the report, which evidence confirmed the findings of the report:

(i) The architect inspected the suspended ceilings and issued an order of condemnation in 2005, stating that the ceilings were failing and sagging throughout the buildings and that the hangers had been placed more widely than four feet apart;

(ii) Several witnesses testified that they witnessed the ceilings sagging, deflecting, or collapsing in 2005;

(iii) A new subcontractor hired to remediate some of the ceiling problems inspected the suspended ceilings before beginning its work in 2005 and testified that the ceiling grid was insufficiently supported;

(iv) Another remediation subcontractor who inspected the sagging ceilings in 2005 testified that Bonitz had not installed the required number of hangers to support the ceiling grid;

(v) The representative of the architect who was part of the final inspection team that inspected the buildings in 2003 admitted that the suspended ceiling tiles were not removed so as to determine whether the hangers were installed properly;

(vi) A GSFIC representative who inspected the ceilings in 2005 and 2006 testified that the sagging ceilings were not properly anchored to the structural members as required by the contract;

(vii) In response to interrogatories, a GSFIC representative testified that the ceilings had collapsed due to defective installation; and

(viii) Another GSFIC representative who inspected the ceilings in 2005 testified that too few hangers were installed to support the ceiling grids.

Here, just as in *McDevitt & Street Co. v. K-C Air Conditioning Svc.*,[12] a subcontractor who installed materials incorrectly, which materials were hidden and whose defects were not discovered until years later when problems occurred, may be liable for breach of contract. Because Bonitz was the only entity to install the ceiling grid and its hangers, and because inspections of those hangers (even though years later when the ceilings began sagging and collapsing) showed that the hangers were installed improperly, a jury could reasonably infer that Bonitz installed those hangers improperly in its original installation, despite Bonitz's evidence to the contrary. See *Miller v. Lomax*[13] ("[t]he jury may infer the existence of facts reasonably and logically consequent on those proved") (punctuation omitted). This distinguishes the present case from *Butler v. Terminix Intl.*,[14] cited by Bonitz, in that in *Butler* no evidence showed that the defendant was negligent in its original work. See *American Pest Control v. Pritchett*[15] (evidence that original work was improperly done presented a question for the jury).

Bonitz argues that other subcontractors worked above the ceiling grid after its installation and therefore may have been responsible for the sagging ceilings. Bonitz freely admits that the contract plans and industry custom anticipated that other subcontractors would work above the ceiling grid once it was installed. But Bonitz points to evidence that conduit was later found lying on the ceiling grid and that lighting fixtures were not properly attached to structural members but instead were attached to the ceiling grid. Not only does this argument ignore the evidence that the hangers were improperly anchored originally and too widely spaced, which had nothing to do with the subsequent work by other subcontractors, but this simply raises at most an issue of fact as to whether the ceiling grid's improper installation by Bonitz or the improper work of

---

[12] *McDevitt & Street Co. v. K-C Air Conditioning Svc.*, 203 Ga. App. 640, 640-642 (418 SE2d 87) (1992).

[13] *Miller v. Lomax*, 266 Ga. App. 93, 101-102 (4) (596 SE2d 232) (2004).

[14] *Butler v. Terminix Intl.*, 175 Ga. App. 816, 817 (1) (334 SE2d 865) (1985).

[15] *American Pest Control v. Pritchett*, 201 Ga. App. 808, 809 (1) (412 SE2d 590) (1991).

subsequent subcontractors caused the ceilings to fail. "[T]he fact that other causes may have contributed to an injury does not absolve a negligent defendant. A negligent act may have more than one proximate cause." *Underwood v. Select Tire.*[16]

Bonitz next argues that the architect's inspections of Bonitz's work absolves Bonitz of any liability. But Bonitz expressly agreed that such inspections would not absolve it of responsibility for defective work. Indeed, the architect here is being sued for performing faulty inspections of Bonitz's work and of the work of others.

Finally, Bonitz argues that some evidence showed that the ceiling grid would have to have been removed in any case to remediate the work of other subcontractors, and that therefore GSFIC incurred no damages arising from Bonitz's alleged improper installation. But this ignores the evidence that the work of the other subcontractors *was supposed* to be performed *after* the ceiling grid was installed; accordingly, a jury could find that the remediation of that work could have also occurred without removing the ceilings. Moreover, a witness testified that not all of the ceilings needed to be removed to effectuate the remediation of the other subcontractors' work. Finally, even if the entire ceiling grid had to removed to remediate the work of other subcontractors, GSFIC was in any case entitled to nominal damages for Bonitz's work performed in breach of its contract. "In every breach of contract the injured party has a right to damages, and if there has been no actual damage, the injured party may recover nominal damages sufficient to cover the costs of bringing the action." (Punctuation omitted.) *Brock v. King.*[17] Bonitz did not move for partial summary judgment on the amount of damages and therefore cannot now maintain on appeal that it would have been entitled to such a ruling. See *Masters v. Clark.*[18]

For these reasons, the trial court erred in granting summary judgment to Bonitz. This moots Fireman's Fund's secondary argument, which argument only applied if we affirmed summary judgment in favor of Bonitz.

*Judgment affirmed in Case No. A10A0504. Judgment reversed in Case No. A10A0581. Barnes and Bernes, JJ., concur.*

DECIDED APRIL 7, 2010.

*Thurbert E. Baker, Attorney General, Denise E. Whiting-Pack, Assistant Attorney General, Autry, Horton & Cole, David R. Cook, Jr.,*

---

[16] *Underwood v. Select Tire*, 296 Ga. App. 805, 814 (5) (676 SE2d 262) (2009).

[17] *Brock v. King*, 279 Ga. App. 335, 341 (3) (629 SE2d 829) (2006), aff'd, *King v. Brock*, 282 Ga. 56 (646 SE2d 206) (2007).

[18] *Masters v. Clark*, 269 Ga. App. 537, 538, n. 3 (604 SE2d 556) (2004).

George C. Reid, Alan S. Lowe, Ellen Schoolar, for appellants.

Sutherland, William R. Wildman, Kent W. Collier, McManus & Warlick, John C. McManus, George W. Warlick, William R. Bryant, Christina A. Craddock, Thompson & Slagle, Jefferson B. Slagle, Hays & Potter, Alexander Yusupov, Swift, Currie, McGhee & Hiers, Charles B. Marsh, Shapiro, Fussell, Wedge & Martin, Ronald J. Garber, for appellees.

Bovis, Kyle & Burch, John V. Burch, Marc H. Bardack, amici curiae.